ACORN, et al.

v.

Edwin EDWARDS, in his official capacity as Governor of the State of Louisiana; J. Christopher Pilley, in his official capacity as Secretary of the Louisiana Department of Health and Hospitals; and T. Jay Ray, in his official capacity as Administrator of the Safe Drinking Water Program, Louisiana Department of Health and Hospitals, Office of Public Health.

Civ. A. No. 93–1479.

United States District Court, E.D. Louisiana.

Nov. 15, 1993.

Order Denying Reconsideration Jan. 12, 1994.

Nathalie M. Walker, Robert Baxter Wiygul, Sharon Carr Harrington, Sierra Club Legal Defense Fund, Inc., New Orleans, LA, for ACORN, Ass'n of Community Organizations for Reform Now, Illene Sippio, individually and as tutrix of her minor daughters, Terri Sippio and Torey Sippio, Frank Cros-

by, individually and as tutor of his minor son, Devin Crosby.

Emile Christian Rolfs, III, William Frank Ridlon, II, Luis Arturo Leitzelar, Breaseale, Sachse & Wilson, Baton Rouge, David Anthony Dalia, LA Office of Atty. Gen., New Orleans, LA, for Edwin Edwards, in his official capacity as Governor of State of LA, J. Christopher Pilley, in his official capacity as Secretary of LA Dept. of Health and Hospitals, T. Jay Ray, in his official capacity as Adm'r of Safe Drinking Water Program, LA Dept. of Health and Hospitals, Office of Public Health.

CHARLES SCHWARTZ, Jr., District Judge.

Before the Court is the defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Alternatively for Summary Judgment. Plaintiffs timely filed formal opposition to the aforesaid motion and the matter was submitted on the briefs without the necessity of any oral hearing. For the reasons hereinafter stated, defendant's Motion to Dismiss and Alternatively for Summary Judgment is DENIED.

## I. PROCEDURAL BACKGROUND.

On February 17, 1993, plaintiffs sent defendants a "Notice of Intent to Sue" letter (Plaintiff's Exhibit "12") as required by 42 U.S.C. § 300j–8, alleging violations of sections 300j–24(c) (failure to send EPA's published list of water coolers that are not lead free) and § 300j–24(d)(1) & (3) (failure to have a remedial program to ensure testing, etc. of water coolers by January 31, 1990). Subsequent to the receipt of the "notice to sue" letter, defendants sent schools an EPA fact sheet which identified some water coolers which are not lead free.[1]

On May 4, 1993, plaintiffs filed suit against the State defendants alleging, at first, only a violation of 42 U.S.C. § 300(j)–24(d)(1) & (3).[2] Thereafter, plaintiffs amended their complaint to allege a violation of 42 U.S.C. § 300j–24(c), having had the opportunity to research and investigate the issue of whether state defendants' dissemination of the EPA "Fact Sheet" on April 5, 1993 constituted compliance with the LCCA.

The obvious purpose of plaintiffs' citizen suit against the State defendants is to force their compliance[3] with the provisions of the Lead Contamination Control Act of 1988 (LCCA), 42 U.S.C. §§ 300j–24(c) and 300j–24(d), amending the Safe Drinking Water Act (SDWA). Specifically, plaintiffs seek an order compelling the State defendants to distribute to Louisiana Schools, as mandated, the "list of drinking water coolers [which are not "lead free"] published under section

1. By its terms section 42 U.S.C. § 300j–24(c) requires the defendants to "provide for the dissemination to [schools] ... the list of drinking water coolers *published under section 300j–23(a)* of this title." The final list of water coolers was published by the EPA in the January 18, 1990, Federal Register, in which publication it expressly acknowledges that it is its "final list" of water coolers "issued pursuant to the Lead Contamination Control Act of 1988." 55 Fed.Reg. 1772 (1990) (Plaintiff's Exhibit "8").

2. Plaintiffs explained that at the time they filed suit, they had not determined whether defendants' dissemination of the EPA "Fact Sheet" instead of the required final list published in the Federal Register constituted compliance with the LCCA.

3. The Court here notes that the sequence of events strongly suggests that plaintiffs' notice of intent to sue and the suit filed sixty day thereafter, has been a significant catalyst in precipitating partial compliance by the state defendants with the provisions of the Lead Contamination Control Act of 1988 (LCCA), 42 U.S.C. § 300j–21 through § 300j–26. Only after plaintiffs sent their notice of intent to sue, did the defendants mail to Louisiana Schools a fact sheet which identified some water coolers which are not lead free. Further, only after the plaintiffs filed the instant suit did the state defendants go to the schools identified in plaintiffs' complaint and assist in the testing of water coolers as required by the LCCA. Plaintiffs suggest that even without the benefit of discovery, the summary judgment evidence supports their contention that the defendants remain in violation of the LCCA's strict mandate, *inter alia*, that *all* coolers that are not lead free be tested, and repaired, replaced, or removed (as testing warrants) by January 31, 1990. The summary judgment record, and more particularly plaintiffs' Exhibit "7", indicates that as of June 1993, approximately 55% of the schools participating in the state's LCCA program have still not had their water coolers which are on the EPA published list tested.

300j–23(a)" [4] and to establish a remedial program which is adequate to ensure that all water coolers which are not lead free and which are located in the participating schools are repaired, replaced, permanently removed, or rendered inoperable unless the cooler is tested and found not to contribute lead to drinking water.[5] Considering that the timetable established by the statute requires that State institute a remedial program which would ensure that such would be accomplished by January 31, 1990, the plaintiffs apparently seek an order that would ensure the State defendants proceed with due haste to comply with the terms of the LCCA, so as to minimize the risk that their children will contract lead poisoning.

While there are no reported decisions involving the merits of a citizen suit brought under the SDWA to enforce the provisions of the LCCA, a thorough search for authorities did reveal one reported decision, *Colorado Environmental Coalition v. Romer*, 796 F.Supp. 457 (D.Colo.1992), wherein the district court awarded attorneys fees and costs under the citizen suit provisions of the SDWA in the amount of $21,193.50 although the case settled and resulted in a stipulated consent decree one day after suit was filed. That court concluded that plaintiff's action was the catalyst for the defendant's acquiescence and the consent decree provided the precise relief plaintiff sought in its complaint, to wit: (1) the defendants disseminate to Colorado day care centers the documents that the LCCA required it to distribute years before the suit was instituted; and (2) that the defendants establish a remedial program consistent with section 300j–24(d)(1) of the Act.

In the *Colorado Environmental Coalition* case, there apparently was no question that the Colorado Environmental Coalition, an environmental group seeking attorney's fees

under the SDWA had standing and was entitled to compensation for time spent after filing notice of intent to sue, even though the state claimed that it had agreed to settle upon receiving such notice. The district court was of the opinion that given the state's failure to comply with the statutory requirements for nearly three years, it was reasonable for the group to prepare for full-blown litigation even in the midst of settlement negotiations that ultimately resulted in a consent decree.

## II. SDWA/LCCA.

The LCCA mandates that the Environmental Protection Agency ("EPA") undertake two duties: (1) "after notice and opportunity for public comment" and "usi[ing] the best information available, ... [the EPA] shall publish a list of each brand and model of drinking water cooler ... which is not lead free,[6] including each brand and model of drinking water cooler ... which is not lead free, including each brand and model of drinking water cooler which has a lead-lined tank."[7] In compliance with section 300j–23(a) of the LCCA, the EPA published the required list of water coolers in the January 18, 1990, Federal Register. 55 Fed.Reg. 1772 (1990).

Regarding state programs, the LCCA requires that by August 1, 1989:

> each State shall establish a program ... to assist educational agencies in testing for and remedying, lead contamination in drinking water from coolers and from other sources of lead contamination at schools under the jurisdiction of such agencies.... [This] program shall include measures for the reduction or elimination of lead contamination from those water coolers which are not lead free and which are located in schools. Such measures shall be adequate to ensure that [by January 31, 1990], all

4. 42 U.S.C. § 300j–24(c).

5. 42 U.S.C. § 300j–24(d).

6. With respect to a drinking water cooler, "lead free" means:
   that each part or component of the cooler which may come in contact with drinking water contains not more than 8 percent lead, except that no drinking water cooler which

contains any solder, flux, or storage tank interior surface which may come in contact with drinking water shall be considered lead free if the solder, flux, or storage tank interior surface contains more that 0.2 percent lead. 42 U.S.C. § 300j–21(2).

7. 42 U.S.C. § 300j–21(2).

such water coolers in schools under the jurisdiction of [local educational agencies] are repaired, replaced, permanently removed, or rendered inoperable unless the cooler is tested and found ... not to contribute lead to drinking water.[8]

The LCCA does not expressly impose a mandatory duty on the local educational agencies/schools to either test for or remedy lead contamination. Participation of the schools and local agencies is voluntary.[9] However, when a school chooses to voluntarily participate in a state program, the statute clearly *mandates* that the state provide the remedial measures discussed above.

## III. DISMISSAL/SUMMARY JUDGMENT IS INAPPROPRIATE.

■ Defendants' contentions on its Motion to Dismiss/Summary Judgment are that: plaintiffs lack "standing" to pursue this matter, and that its lack of standing is sufficiently jurisdictional to require dismissal under FRCP Rule 12(b)(1); and that plaintiffs' alleged failure to comply with the notice requirements of 42 U.S.C. § 300J–8(b) [10] is jurisdictional and thus, requires dismissal.

Under the SDWA, EPA regulations provide that the notice letter shall include:

(1) sufficient information to permit the recipient to identify the specific requirement alleged to have been violated,

(2) the activity alleged to constitute a violation,

(3) the person or persons responsible for the alleged violation,

(4) the date or dates of the alleged violation, and

(5) the full name, address, and telephone of the person giving notice.

40 C.F.R. § 135.12(a). As more fully explained herein below, the plaintiffs' Notice Letter complies with the requirements set forth above.

Plaintiff's 60–Day Notice Letter cites the two requirements of the LCCA that the defendants have allegedly violated, to wit:

The suit will allege that officials of the State of Louisiana are in violation of section 300j–24(c) of the Act, which addresses dissemination of the Environmental Protection Agency's ("EPA") list of lead contaminated water coolers to schools and day care facilities, and section 300j–24(d) of the Act, which concerns remediation of lead contamination in drinking water consumed by school children.

The Act requires the Administrator of the EPA to identify and publish a list of the brands and models of drinking water coolers which are not lead free by February 8, 1989. 42 U.S.C. § 300j–23(a). The Act also requires each state to distribute the EPA list of water coolers to schools and day care facilities, and to establish a remedial action program to ensure that EPA listed water coolers are disconnected, repaired, or removed from schools by January 31, 1990. 42 U.S.C. § 300j–24(c) and (d).

Section 300j–24 provides in pertinent part:

Within 9 months after October 31, 1988, each State shall establish a program, consistent with this section, to assist local educational agencies in testing for, and remedying, lead contamination in drinking water from coolers and from other sources of lead contamination at schools under the jurisdiction of such agencies.

    \*    \*    \*    \*    \*    \*

In the case of drinking water coolers, such program shall include measures for the reduction or elimination of lead contamination from those water coolers which are not lead free and which are located in

---

**8.** 42 U.S.C. § 300j–24(d)(1) & (3).

**9.** Section 300j–24(d)(2) does impose a mandatory duty on participating local educational agencies to make testing results available to the public.

**10.** 42 U.S.C. § 300j–8(b) provides in pertinent part:

No civil action may be commenced—

(1) Under subsection (a)(1) of this section respecting a violation of a requirement prescribed by or under this subchapter—

(A) prior to sixty days after the plaintiff has given notice of such violation (i) to the Administrator (ii) to any alleged violator of such requirement and (iii) to the State in which the violation occurs.

schools. Such measures shall be adequate to ensure within 15 months after October 31, 1988, all such water coolers in schools under the jurisdiction of such agencies are repaired, replaced, permanently removed, or rendered inoperable unless the water cooler is tested and found (within the limits of testing accuracy) not to contribute lead to drinking water.

42 U.S.C. § 300j–24(d)(1)–(3).

The State of Louisiana has failed to distribute the EPA list of water coolers to schools and day care facilities. Accordingly, many Louisiana schools and day care facilities continue to be unaware of the presence of lead contaminated water coolers in their schools since the State has failed to provide them with this information in violation of section 300j–24(c).

The State of Louisiana has also failed to implement a remedial action program consistent with section 300j–24(d). Specifically, the State has failed to create measures to ensure the removal, repair, replacement, or disconnection of all water coolers contaminated by lead by January 1, 1990. The school children of this State continue to be exposed to potentially dangerous lead levels from drinking water coolers at their schools and day care centers in direct violation of section 300j–24(d).[11]

The Court is of the opinion that because the specific requirements of the LCCA were directly cited by the plaintiffs to the defendants and that the particular aspects of the defendants' failure to comply with such requirements were adequately explained within the four corners of plaintiffs' 60–day Notice Letter, the defendants had more than sufficient information to identify the specific requirements allegedly violated within the meaning of 40 C.F.R. § 135.12(a).

Defendants' reliance on *Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.,* 830 F.Supp. 1525, 36 ERC 1833 (D.N.J.1993) (a Clean Water Act case) is misplaced. As the plaintiffs aptly point out, the citizen suit provision of the CWA is narrowly drawn and can only be brought by an

"adversely affected" person against any person "who is alleged to be in violation of (A) an *effluent standard* or *limitation* under this chapter or (B) an *order* issued by [EPA] or a State with respect to such a standard or limitation...." 33 U.S.C. § 1365(a)(1) (emphasis supplied). EPA regulations promulgated under the CWA require a citizen suit notice letter to "include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated...." 40 C.F.R. § 135.3(a).

In contrast, a citizen suit under the SDWA can be brought by any person (i.e., there is no requirement that the person be "adversely affected") against any person "alleged to be in violation of any requirement prescribed by the subchapter." 42 U.S.C. § 300j–8(a)(1). EPA regulations under the SDWA commensurately require a citizen suit to "include sufficient information to permit the recipient to identify the specific requirement alleged to have been violated...." 40 C.F.R. § 135.12(a).

The precise holding of *Hercules,* was that under EPA's CWA notice regulations, the "monitoring", "reporting", and "recordkeeping" violations, which were not specifically identified in plaintiff's original notice letter, could not be added to plaintiff's citizen suit without first being noticed under the EPA regulations. *Hercules,* 830 F.Supp. at 1533–35, 36 ERC at 1840–41. In other words, *Hercules* stands for the proposition that violations alleged in the citizen's suit under the CWA which were not the subject of the notice letter are not properly before the court.

Plaintiffs in the case at bar have not sought leave to add any specific requirement violations to their citizen suit that were not addressed in their notice letter. Defendant's argument that it is not obliged by the SDWA to send the EPA's final list of water coolers published in the January 18, 1990 Federal Register goes to the merits of the plaintiffs' citizen suit and is not properly invoked as an argument requiring dismissal of plaintiffs'

---

**11.** Excerpt from Plaintiffs' LCCA 60–day Notice Letter dated February 17, 1993 (Plaintiffs' Exhibit "1").

suit for lack of Article III standing. The Court further rejects defendants' argument that plaintiffs' informational interests must be a requirement under the SDWA, and thus identified in the notice letter. As plaintiffs' memorandum in response to defendants' reply brief aptly points out, EPA regulations do not require that plaintiffs' injuries be included in the 60–day Notice Letter.

In the case at bar it is allegedly the defendants' continuing *inactivity* or *failure to comply* with the requirements of the SDWA which constitute violations of the Act. It cannot be seriously argued that the plaintiffs' 60–day Notice Letter was deficient with respect to notifying defendant's of their alleged continuing *failure* to comply with the provision of the SDWA (i.e., failure to distribute the EPA' list of water coolers and failure to implement a remedial action program consistent with section 300j–24(d)).

Moreover, and as required, plaintiffs' 60–day Notice Letter was addressed to all defendants and stated that the forthcoming citizen suit would "allege that officials of the State of Louisiana are in violation of" the provisions discussed herein above. There can be no serious dispute that the 60–day notice adequately identifies the location of the alleged violations, to wit: schools and day care facilities under the jurisdiction of the Louisiana Department of Health and Hospitals, where the defendant officials of the State of Louisiana, Pilley and Ray, are employed. Their address is contained in plaintiffs' notice letter. The Court agrees with the plaintiffs, that whereas here the alleged violation is inactivity or a failure to comply with the SDWA, the location requirement is somewhat anomalous.

There is no question that plaintiffs' 60–day notice letter accurately identifies the dates of the alleged violations stating that defendant's violations are continuing.

Defendants contend that plaintiff ACORN (Association of Community Organizations for Reform Now) did not give notice, but rather, Louisiana ACORN gave notice. Plaintiffs' submissions on summary judgment clearly show that both "ACORN" and "Louisiana ACORN" are one and the same organization. Therefore, the Supreme Court's decision in *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) is inapposite. The facts of *Hallstrom* were that petitioners completely failed to send any notice at all to the appropriate parties prior to filing a citizen suit pursuant to the Resource Conservation and Recovery Act (RCRA).[12]

In April of 1981, believing Tillamook County's landfill operation violated standards under the RCRA, petitioners in *Hallstrom* sent written notice of their intent to suit to the County. A year later petitioners filed suit. Petitioners completely failed to notify Oregon's Department of Environmental Quality and the EPA as required by § 6972(b)(1), the appropriate notice provision. The Supreme Court held that the district court must dismiss the action as barred by the statute since the statute itself put petitioners on notice of the requirements for bringing a citizen suit with which requirements petitioners failed to comply.

Plaintiffs in the case at bar, which include ACORN (i.e., identified in the Notice to Sue Letter as Louisiana ACORN), Sippio and Crosby, served adequate notice. Defendants do not deny that plaintiffs Sippio and Crosby served adequate notice or notice which substantially complied with the requirements.

EPA regulations governing the adequacy of required 60–day notice provide that notice must "include sufficient information to permit the recipient to identify . . . the full name, address, and telephone number of the person giving notice."[13] Plaintiffs' notice letter sets forth the correct business address and telephone number of plaintiff ACORN, as well as, the names, addresses and telephone numbers of plaintiffs Sippio and Crosby.

In *Connecticut Coastal Fishermen's Association v. Remington Arms Company, Inc.,*

---

**12.** The 60–day notice provision, 42 U.S.C. § 6972(b)(1) of the RCRA was modeled upon § 304 of the Clean Air Amendments of 1970. *Hallstrom v. Tillamook County,* 493 U.S. 20, 22–24, 110 S.Ct. 304, 307 (1989). The SDWA 42 U.S.C. § 300j–8(b) has also incorporated a 60–day notice provision patterned after § 304. *Id.*

**13.** 40 C.F.R. 135.12.

777 F.Supp. 173 (D.Conn.1991),[14] the court held that although the name on the notice to sue letter identified the plaintiff as "Connecticut Coastal Sportsman's Association," [15] plaintiffs gave sufficient notice under the citizen suit provision of the RCRA. Discussing the Supreme Court's decision in *Hallstrom,* the court in *Connecticut Coastal Fishermen's* determined that notice was sufficient so long as the organization remained the same and that the mere change in the name of the organization did not alter the fact that the defendants received the requisite notice of intent to sue.[16]

In the case at bar, the plaintiff Louisiana ACORN has submitted affidavits and other documents supporting its statement that Louisiana ACORN and ACORN are one and the same organization and the defendants have submitted no evidence to the contrary. Notwithstanding the foregoing, considering the fact that plaintiffs Sippio and Crosby gave proper notice, ACORN is deemed to have "substantially complied" with statutory requirements of notice.[17]

Moreover, defendants' contention that plaintiffs' suit must be dismissed for failure to notify the Orleans Parish School Board is wholly without merit. 40 C.F.R. 135.11 only requires that a notice letter under SDWA be served upon "an alleged violator." A thorough review of the plaintiffs' complaint in the captioned case reveals no allegations against the Orleans Parish School Board. The only defendants named are the state defendants listed in the foregoing caption. Finally, sections 300j–24(d)(1) and (3) and section 300j–24(c) (i.e., the sections which form the basis of plaintiffs' lawsuit against the state defendants) only address obligations of the state and not obligations of schools or school boards.

■ The Court is further of the opinion that ACORN has standing to bring this action because it satisfies the requirement set forth by the Fifth Circuit in *Save Our Community v. U.S.E.P.A.,* 971 F.2d 1155, 1160 (5th Cir.1992) [18], to wit:

> Representational standing is appropriate where: '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of the individual members in the lawsuit.' *Id.*

The Fifth Circuit explained that the "[s]tanding analysis focuses upon '[w]hether a party has a sufficient stake in an otherwise justifiable controversy to obtain judicial resolution of that controversy.'" *Id.*

ACORN satisfies the above enumerated requirements for organizational standing. The "zone of interests" test enunciated in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 884–86, 110 S.Ct. 3177, 3187, 111

---

**14.** In *Connecticut Coastal Fishermen's Association (CCFA),* plaintiff CCFA brought suit against the owners and operators of a trap and skeet shoot club alleging violations of the Clean Water Act and the RCRA.

**15.** Plaintiff organization's name as reflected in its Articles of Incorporation was actually "Connecticut Coastal Fisherman's Association."

**16.** The plaintiff in *Connecticut Coastal Fishermen's* submitted affidavits supporting its statement that the CCSA changed its name to CCFA, but otherwise remained the same and no evidence was submitted to the contrary. Accordingly, the Court held that there is no genuine issue as to the material fact that the defendants received the requisite notice of intent to sue from plaintiff. 777 F.Supp. at 187.

**17.** See, e.g., *Student Public Interest Research Group of New Jersey v. AT & T Bell Laboratories,* 617 F.Supp. 1190, 1194 (D.C.N.J.1985). In that case, the defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted, raising the issues whether plaintiffs had standing, raising the argument that because one of plaintiffs, Friends of Earth (FOE), should be precluded from participation in the suit because it failed to give the requisite 60–day notice under the Federal Water Pollution Control Act. The defendant acknowledged that the plaintiff Student Public Interest Research Group (SPIRG) complied with the notice provisions. The court held "that because one plaintiff served adequate notice, both plaintiffs 'substantially complied' with the requirements, and the defendant's right to adequate notice was preserved." *Id.* at 1193–94.

**18.** In the *Save Our Community* case, appellant Trinity challenged the SOC's Article III standing to sue seeking enforcement of the Clean Water Act (CWA) under it citizen suit provision. SOC sought to represent the interests of its members.

L.Ed.2d 695 (1990)[19] cited in plaintiff's brief does not apply to this case. ACORN's case was brought pursuant to the citizen suit provision of the SDWA (i.e., 42 U.S.C. § 300j–8), which authorizes suits by "any person."[20]

The first factor under the test enunciated in *Save Our Community*, requires this Court to determine whether any ACORN's "members would otherwise have standing to sue in their own right."[21] The requirement is satisfied if the organization's members, "or any one of them, are suffering immediate or threatened injury as a result of the challenged action."[22] The Fifth Circuit in *Save Our Community* noted that other courts have also recognized the low threshold for sufficiency of injury. The purpose of the inquiry is to determine whether the requisite injury really has occurred or will occur in the future to members of the organizations.[23]

ACORN has submitted the affidavits of the two of its members and its Head Organizer (Plaintiffs' Exhibits 1, 2, and 3). The affidavits of Williams and Herbert establish that they are parents of children attending schools in the state of Louisiana which have water coolers in operation that are listed on the EPA's list published in the Federal Register as being "not lead free." Beth Butler, Acorn's Head Organizer's affidavit establishes among other things, that (1) the purpose of the organization is to attain the advancement of low and moderate income people as citizens of the United States and their respective communities and states, in every area of their interest and concern; (2) that Louisiana ACORN members are concerned about their children being exposed to potential lead poisoning and it has conducted meetings, forums, etc. focussing upon its members concerns regarding lead poisoning; (3) Louisiana Acorn members include approximately 4000 families throughout the state of Louisiana who have children that attend schools throughout the state; and (4) that the defendants' failure to properly implement the LCCA has adversely affected ACORN members throughout the state, not just in Orleans Parish, who have children attending schools who have not received the EPA's "FINAL LIST" published in the Federal Register and which have coolers which are not "lead free" in operation without any testing.

Injury in fact may shown by the adverse effect of defendants' alleged failure to comply with the dictates of the LCCA insofar as any such failure to comply increases the risk that ACORN members' children will be exposed to lead poisoning. The defendants' cannot seriously argue the risk of harm is absent where State compliance with the LCCA's terms is mandated in order to obviate the attendant risk of lead poisoning of school children drinking from water coolers which are "not lead free" and have not been tested.

The Court finds the House Committee Report which accompanied section 1431 of the SDWA and which discusses its imminent hazard provision instructive, wherein it is stated:

> Furthermore, while the risk of harm must be "imminent" for the Administrator to act, the harm itself need not be. Thus, for example, the Administrator may invoke this section when there is an imminent likelihood of the introduction into drinking water of contaminants that may cause health damage after a period of latency.

> Among those situations in which endangerment may be regarded as "substantial" are the following:

> (1) a substantial likelihood that contaminants capable of causing adverse health effects will be ingested by consumers if preventive action is not taken;

**19.** In *Lujan*, suit was brought under section 10 of the Administrative Procedures Act (APA), 5 U.S.C. § 702, which requires a plaintiff to be within the "zone of interests" that the aforesaid statute was designed to protect. 110 S.Ct. at 3186.

**20.** See e.g., *Save Our Community (SOC) v. U.S.E.P.A.*, 971 F.2d 1155, 1160 n. 10 (5th Cir. 1992) (holding that the Clean Water Act (CWA) confers standing to the limits of the Constitution since under the CWA "any citizen may commence a civil action.")

**21.** 971 F.2d at 1160.

**22.** *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211–12, 45 L.Ed.2d 343 (1975).

**23.** *Public Citizen v. F.T.C.*, 869 F.2d 1541 at 1552 (D.C.Cir.1989).

(2) a substantial statistical probability that disease will result from the presence of contaminants in drinking water; or

(3) the threat of substantial or serious harm (such as exposure to carcinogenic agents or other hazardous contaminants....) H.R.Rep. No. 1185, 93rd Cong., 2d Sess. 35–36, *reprinted in* [1974] U.S.Code & Cong.Ad.News 6454, 6487–88.[24]

Plaintiff ACORN members have met any requirement of showing that the threat to their interests are "actual or imminent" and not simply conjectural or hypothetical. ACORN points out in its opposition memorandum that ACORN members William and Herbert have children currently attending schools which have water coolers which are not lead free presently in operation and therefore, their children are immediately threatened with harm.

## IV.  CONCLUSION.

Plaintiffs have demonstrably fulfilled the congressional policies underlying the subject notice requirements, to wit: (1) *via* plaintiffs' 60–day Notice Letter, they have allowed governmental agencies an opportunity to enforce the law;[25] and (2) they have allowed the state defendants (i.e., alleged violators) the opportunity to comply with the law, either of which could render their citizen suit unnecessary.[26] For all of the above and foregoing reasons, the Court is of the opinion that plaintiffs have given adequate notice and have standing to bring their citizen suit. Accordingly,

IT IS ORDERED that Defendants' Motion to Dismiss for Lack of Jurisdiction and Alternative Motion for Summary Judgment is hereby DENIED.

## ON RECONSIDERATION

Before the Court is defendants' Motion for Reconsideration of this Court's Minute Entry Order entered November 16, 1993 in the captioned matter denying their Motion to Dismiss for lack of subject matter jurisdiction and alternative Motion for Summary Judgment. Plaintiffs have filed formal opposition to the aforesaid motion for reconsideration. The Court, having determined that there is no necessity for oral argument, deems the matter submitted on the briefs.

It was only after careful consideration of the voluminous submissions of the parties regarding defendants' Motion to Dismiss and/or for Summary Judgment that this Court issued its nineteen (19) page minute entry order denying the aforesaid motion. In their motion for reconsideration, defendants do not assert any new arguments, facts[1] or case law which would give this Court any reason to modify its prior ruling in any respect.

Accordingly, and for all of the above and foregoing reasons,

IT IS ORDERED that defendants' Motion for Reconsideration is hereby DENIED.

---

**24.** *United States v. Northeastern Pharm. & Chem. Co.*, 579 F.Supp. 823, 846 n. 28 (W.D.Mo.1984).

**25.** The plaintiffs' 60–day Notice Letter was sent to the EPA, the United States Department of Justice, and the Louisiana Attorney General.

**26.** In response to the plaintiffs' 60–day notice letter, the defendants instead of sending the EPA list of water coolers published in the January 18, 1990 Federal Register sent an "EPA Fact Sheet." Essentially, the defendants were given the opportunity to comply but elected to send the "EPA Fact Sheet."

**1.** In this vein, the Court instructs the parties to refrain from filing any further motions that they may consider dispositive of the issues joined herein (i.e., Motions to Dismiss and/or For Summary Judgment, for Reconsideration thereof, or Re–Reconsideration) until the discovery phase of this matter has proceeded to near completion. It is this Court's understanding that discovery has been stymied from the outset awaiting this Court's November 16, 1993 ruling on defendants' motion to dismiss and the trial of this matter was continued and reset *via* telephone status conference on January 4, 1994, so that the parties might have the opportunity to engage in discovery prior to any decision on the merits.